**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: ROBLOX CORPORATION CHILD SEXUAL EXPLOITATION AND ASSAULT LITIGATION | MDL Docket No. 3166 |

**DEFENDANTS ROBLOX CORPORATION, DISCORD INC., SNAP INC., AND META
PLATFORMS, INC.'S JOINT OPPOSITION TO PLAINTIFF'S MOTION FOR
TRANSFER OF ACTIONS UNDER 28 U.S.C. § 1407 FOR COORDINATED OR
CONSOLIDATED PRETRIAL PROCEEDINGS**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

I.    DEFENDANTS' PLATFORMS ................................................................................ 2

II.   PLAINTIFFS' CLAIMS ........................................................................................... 5

LEGAL STANDARD ......................................................................................................... 7

ARGUMENT ....................................................................................................................... 7

I.    THE PANEL SHOULD NOT CENTRALIZE THESE ACTIONS. ................................ 7

    A.    The Arbitration Issues Are Distinct. ................................................................. 7

    B.    The Parties Are Materially Different. ............................................................... 10

    C.    The Facts and Merits Issues Are Not the Same. .............................................. 12

        1.    Distinct Incidents at Varying Times and in Different Places. ................. 12

        2.    The Cases Challenge Different Allegedly Fraudulent Statements. ......... 15

        3.    The Cases Challenge Different Platforms, Features, and Controls. ........ 16

    D.    Informal Coordination Is a Practical Alternative to Centralization. .................... 18

II.   ANY CENTRALIZATION SHOULD OCCUR IN THE NORTHERN
DISTRICT OF CALIFORNIA. ................................................................................. 19

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acthar Gel Antitrust Litig.*,
    543 F. Supp. 3d 1375 (J.P.M.L. 2021)...................................................................7

*In re Asbestos & Asbestos Insulation Material Prods. Liab. Litig.*,
    431 F. Supp. 906 (J.P.M.L. 1977)......................................................................14

*In re Baby Food Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    544 F. Supp. 3d 1375 (J.P.M.L. 2021).............................................................10, 19

*In re Belviq (Lorcaserin HCl) Prods. Liab. Litig.*,
    555 F. Supp. 3d 1369 (J.P.M.L. 2021)..................................................................18

*In re Benzoyl Peroxide Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    743 F. Supp. 3d 1373 (J.P.M.L 2024)...................................................................16

*In re Blue Spike, LLC, Pat. Litig.*,
    278 F. Supp. 3d 1379 (J.P.M.L. 2017)..................................................................18

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) ..............................................................................8

*In re Children's Pers. Care Prods. Liab. Litig.*,
    655 F. Supp. 2d 1365 (J.P.M.L. 2009)..................................................................10

*In re Chrysler Pacifica Fire Recall Prods. Liab. Litig. MDL No. 3040*,
    No. 2:22-cv-03040, 2024 WL 868239 (E.D. Mich. Feb. 28, 2024) ...........................9

*In re: the Church of Jesus Christ of Latter-Day Saints Sexual Abuse Litig.*,
    776 F. Supp. 3d 1356 (J.P.M.L. 2025)..................................................................13

*Coinbase, Inc. v. Bielski*,
    599 U.S. 736 (2023)............................................................................................9

*In re CP4 Fuel Pump Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    412 F. Supp. 3d 1365 (J.P.M.L. 2019).............................................................10, 11

*In re Dividend Solar Fin., LLC, & Fifth Third Bank Sales & Lending Pracs. Litig.*,
    753 F. Supp. 3d 1365 (J.P.M.L. 2024)..................................................................20

*Doe (K.B.) v. Backpage.com, LLC*,
    768 F. Supp. 3d 1057 (N.D. Cal. 2025) ................................................................20

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) ............................................................14

*Doe v. MySpace*, *Inc.*,
528 F.3d 413 (5th Cir. 2008) ...............................................................15

*In re Eli Lilly & Co. (Cephalexin Monohydrate) Pat. Litig.*,
446 F. Supp. 242 (J.P.M.L. 1978) ........................................................19

*In re Future Motion, Inc. Prods. Liab. Litig.*,
709 F. Supp. 3d 1394 (J.P.M.L. 2023)...................................................20

*Herrick v. Grindr LLC*,
765 F. App'x 586 (2d Cir. 2019) ..........................................................15

*In re Hotel Indus. Sex Trafficking Litig.*,
433 F. Supp. 3d 1353 (J.P.M.L. 2020)..............................................12, 13

*In re Hotel Indus. Sex Trafficking Litig. (No. II)*,
730 F. Supp. 3d 1360 (J.P.M.L. 2024)..............................................12, 13

*In re Katz Interactive Call Processing Pat. Litig.*,
481 F. Supp. 2d 1353 (J.P.M.L. 2007)...................................................14

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) .............................................................16

*In re Keffer Dev. Servs., LLC, Data Sec. Breach Litig.*,
MDL No. 3159, 2025 WL 2327173 (J.P.M.L. Aug. 8, 2025) .................20

*In re Maybelline New York & L'Oréal Paris Cosmetic Prods. Mktg. & Sales Pracs. Litig.*,
949 F. Supp. 2d 1367 (J.P.M.L. 2013)...................................................19

*McKinney v. Emery Air Freight Corp.*,
954 F.2d 590 (9th Cir. 1992) .................................................................8

*NetChoice, LLC v. Bonta*,
770 F. Supp. 3d 1164 (N.D. Cal. 2025) .................................................20

*In re Not-For-Profit Hosps./Uninsured Patients Litig.*,
341 F. Supp. 2d 1354 (J.P.M.L. 2004)...................................................14

*M.H. on behalf of C.H. v. Omegle.com*,
122 F.4th 1266 (11th Cir. 2024) ..........................................................15

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Six Flags Fair & Accurate Credit Transactions Act (FACTA) Litig.,*
289 F. Supp. 3d 1343 (J.P.M.L. 2018)........................................................................7

*In re Soc. Media Adolescent Addiction/Pers. Injury Prods. Liab. Litig.,*
637 F. Supp. 3d 1377 (J.P.M.L. 2022)......................................................................14

*In re Sorin 3T Heater-Cooler Sys. Prods. Liab. Litig.,*
273 F. Supp. 3d 1357 (J.P.M.L. 2017)......................................................................18

*Turner v. Tesla, Inc.,*
686 F. Supp. 3d 917 (N.D. Cal. 2023) ........................................................................8

*In re Uber Techs., Inc., Data Sec. Breach Litig.,*
304 F. Supp. 3d 1351 (J.P.M.L. 2018)........................................................................9

*In re Uber Techs., Inc., Passenger Sexual Assault Litig.,*
699 F. Supp. 3d 1396 (J.P.M.L. 2023)...............................................................13, 14

*Van De Hey v. EPAM Sys. Inc.,*
No. 3:24-cv-08800, 2025 WL 829604 (N.D. Cal. Feb. 28, 2025)..........................20

*In re Varsity Spirit Athlete Abuse Litig.,*
677 F. Supp. 3d 1376 (J.P.M.L. 2023)...........................................................12, 13, 18

*In re Video Game Addiction Prods. Liab. Litig.,*
737 F. Supp. 3d 1353 (J.P.M.L. 2024)...............................................................10, 12

*In re Yellow Brass Plumbing Component Prods. Liab. Litig.,*
844 F. Supp. 2d 1377 (J.P.M.L. 2012)......................................................................10

**Statutes**

9 U.S.C.
§ 4................................................................................................................................8
§ 401........................................................................................................................1, 8

18 U.S.C. § 2246..........................................................................................................8

28 U.S.C.§ 1407.......................................................................................................7, 12

**Other Authorities**

"District Judge Beth Labson Freeman," Lex Machina, https://law.lexmachina.com/federal-
court/judge/3506 (last visited Oct. 14, 2025)..........................................................20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

"District Judge Rita Faye Lin," Lex Machina, https://law.lexmachina.com/federal-court/judge/13761006 (last visited Oct. 14, 2025).................................................................20

"Snap Inc. Terms of Service," Snap Inc., https://www.snap.com/terms (last visited Oct. 14, 2025) ....................................................................................................................................5

"Terms of Use," Instagram, https://help.instagram.com/termsofuse (last visited Oct. 14, 2025) ....................................................................................................................................5

# INTRODUCTION

Plaintiff asks the Panel to centralize 31 cases alleging that operators of four widely used, unique digital platforms are liable for the claimed exploitation of individual plaintiffs by third-party perpetrators because those perpetrators communicated with the plaintiffs using one or more platforms. Plaintiffs allege abhorrent crimes that Defendants take very seriously—indeed, each uses its own robust safety measures to detect and remove objectionable content and users who violate their terms. Although there is no legal basis to hold Defendants liable for these third-party crimes, any evaluation of the claims should be decided on a case-specific basis, not in an MDL.

***First***, many cases will involve motions to compel arbitration. Those motions will turn on individualized facts, including the methods and dates of assent to each arbitration agreement. Far from streamlining these cases, centralizing them will delay decisions on idiosyncratic threshold questions that separate district courts could more efficiently address. Even the application of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), 9 U.S.C. § 401, if it applies to platforms at all, would turn on distinct facts, because the EFAA does not apply retroactively nor to claims that fall outside the statute's specific definition of "sexual assault dispute." Further, if this case-specific inquiry leads to arbitration for different Defendants in different cases, the result will be a variable roster of defendants, making centralized case management impractical and removing the claimed common issues from many cases remaining before the transferee court. Potential appeals from decisions on motions to compel arbitration—and resulting mandatory stays—would further complicate case management.

***Second***, even assuming these cases are litigated in court, they are too varied to benefit from centralization. The cases involve individualized legal issues and factual allegations, including claimed reliance on statements by different Defendants across nearly 20 years. Each centers on a

discrete event—often criminal—that individual plaintiffs claim to have experienced at the hands of different third parties. Each will involve necessarily different evidence.

**Finally**, the parties have already shown informal coordination is viable. For example, they have agreed to briefing schedules in most cases. With limited exceptions, the plaintiffs have provided Defendants account information so Defendants can identify the relevant accounts, preserve evidence, and evaluate arbitrability. And Defendants jointly filed this brief and others.

Centralizing such a diverse set of cases would defeat the efficiencies MDLs are designed to provide. It would be an enormous undertaking for a single transferee court to craft rulings on arbitration, dispositive motions, discovery orders, and bellwether selection that reasonably advance dozens of lawsuits presenting so many significant variations. By contrast, a district court could, in the ordinary course, tailor its rulings to the specific allegations before it, achieving any benefits centralization would provide. The Panel should deny the transfer motion.

## BACKGROUND

### I.   DEFENDANTS' PLATFORMS

**Roblox**: Roblox offers an interactive online gaming platform on which users play and create games, called "experiences." (*Doe v. Roblox*, No. 3:25-cv-05753-JSC (N.D. Cal.), Dkt. No. 1 ¶¶ 12, 18, 20 ("Compl.").) Over 40 million unique "experiences" span many different genres. (*See id.* ¶¶ 18, 28.) Users can communicate with each other outside of experiences or through "[g]ameplay interactions" within them. (*See id.* ¶ 20.) Roblox is available to users of all ages, including under-13 users. Minors must obtain parental consent to create an account. (*Id.* ¶ 26.)

Roblox's platform has evolved considerably, and in relevant ways, since its 2006 launch. (*Id.* ¶ 18.) In the last five years alone, Plaintiff alleges that Roblox has at different times: (1) changed search algorithms to match the user's reported age (*id.* ¶ 103); (2) used "machine learning" to remove content (*id.* ¶ 47); (3) "relaxed" chat moderation for certain users (*id.* ¶ 104);

(3) introduced "voice calls" (*id.* ¶¶ 113-14); (4) changed the way adults can friend and message minors (*id.* ¶¶ 29-30, 111); (6) used AI to moderate content (*id.* ¶ 126 & n.130); and (7) introduced new safety features (*id.* ¶¶ 39, 136) and new parental controls (*id.* ¶ 143).

Roblox takes many steps to combat abuse of its platform. Its current default settings do not allow adults to send direct messages to users under 13. (*Id.* ¶ 30.) Parental controls allow parents to filter by content maturity, block experiences, and determine with whom (if anyone) their child may chat. (*Doe v. Roblox*, No. 3:25-cv-07909-LB (N.D. Cal.), Dkt. No. 1 ¶ 135.) Parents can see what their child is doing on Roblox, including their private messaging history and friends list. (*Id.*) Roblox moderates content using human review and automated tools, employs teams to identify and remove exploitative content, and engages with law enforcement and other organizations that fight child exploitation. (*Id.* ¶¶ 125, 129.) Roblox informs users that it cannot prevent all problematic content, encourages users to report abuse, and encourages parents to talk to their kids about internet safety and to know what their kids are doing online. All Roblox users must agree to its Terms of Use, which include a mandatory arbitration provision. (*Cf.* Compl. ¶ 11; *Doe v. Roblox*, No. 4:25-cv-03520-YGR (N.D. Cal.), Dkt. No. 42 ¶ 23; *see id.*, Dkt. No. 37 at 9-10.)

***Discord***: Discord operates a global voice, video, and text communications service. Users communicate through direct messages, group messages, or in small chat rooms called "servers." (Compl. ¶ 149.) Unlike social media platforms, Discord does not use algorithms to select content for users. Discord started as and remains at its core an online forum for gamers to message each other. (*Id.* ¶ 150.) Discord takes many steps to provide a safe and enjoyable environment for all of its users and takes content moderation and safety very seriously. Users must be at least 13 years old, and Discord uses a neutral age screen during the sign-up process to prevent underage users from registering. (*Id.* ¶ 154.) Communications on Discord are also subject to significant human

and automated moderation. "Teen Safety Assist," for example, automatically blurs potentially sensitive content and sends alerts when teen users receive a message from someone for the first time. (*Id.* ¶ 161.) "Safe Direct Messaging" automatically scans and can block messages that contain explicit content. (*Id.* ¶¶ 154, 161, 208.) Discord's "Family Center for Parents and Guardians" allows parents to closely monitor their children's communications. (*Id.* ¶ 201.) Discord continuously invests in proactively detecting and removing improper content, including message filtering, to ensure users can control with whom they communicate. (*Id.* ¶ 211.)

**Snap**: Snap operates Snapchat, an online camera-based messaging platform. (*See Doe v. Roblox*, No. 4:25-cv-07174-AMO (N.D. Cal.), Dkt. No. 1 ¶¶ 150-51.) Snapchat allows users to communicate through Snaps (photographs or short videos taken with the app's camera), text messages, stickers, and personalized digital avatars called Bitmojis. (*Id.*) Just as in-person conversations exist only in the moment, messages sent over Snapchat delete by default. (*Id.*) Snap prohibits use by children under 13. (*Id.* ¶ 54.) Parental-control features, such as the Family Center, allow parents to see a child's list of friends and the accounts with which the child has communicated in the last week. (*Id.* ¶ 155.) By design, Snapchat's architecture minimizes the risk of strangers connecting with minors, instead facilitating communications between existing contacts. Snap uses myriad measures to combat bad actors seeking to exploit users, including through robust in-app tools allowing users to report bad actors without revealing that report to the reported user. Snap encourages its users to report any safety concerns and provides teens and their parents a guide to digital safety, which aims to educate and empower families around the risks they may face online, including nude and intimate images and sextortion. Snap's Terms of Service include an arbitration agreement. (*See* https://www.snap.com/terms.)

**Meta**: Meta owns and operates Instagram, among other social media platforms. (*Doe v.*

*Roblox*, No. 3:25-cv-07143-AMO (N.D. Cal.), Dkt. No. 1 ¶¶ 12, 140.) Through Instagram, users can post photos and videos, interact with that content, and exchange private messages via voice, video, photos, or text. (*Id.* ¶ 139.) Instagram's Terms of Service provide that users must be at least 13 years old to use the app. (*Id.* ¶ 148.) Instagram's Community Standards prohibit "content or activity that sexually exploits or endangers children," and Instagram has a "zero tolerance [policy] when it comes to sharing sexual content involving minors." (*Id.* ¶ 158.) Meta uses "sophisticated technology and other techniques not only to detect child exploitation imagery and remove it, but also to detect and prevent grooming or potentially inappropriate interactions between a minor and an adult." (*Id.* ¶ 159.) Meta also uses "technology to prevent potentially suspicious accounts from interacting with teen accounts and accounts that predominantly feature minors, as well as from finding each other." (*Id.* ¶ 164.) Instagram has a mandatory arbitration clause in its Terms of Service. (*See* https://help.instagram.com/termsofuse.)

## II.    PLAINTIFFS' CLAIMS

Plaintiff, a 14-year-old Alabaman, alleges that in 2024, when she was 13, she met an adult on Roblox who pretended to be her age. (Compl. ¶¶ 9, 221.) The perpetrator allegedly "groomed" her on Roblox, and their "interactions continued . . . on Discord," where he sent "sexually explicit images of himself" and "coerce[d] [her] into continuing to interact with him" by giving her Robux, Roblox's virtual currency. (*Id.* ¶¶ 222-23.) In January 2025, the perpetrator met Plaintiff at a restaurant, tried to assault her, and was thwarted by law enforcement. (*Id.* ¶ 224.)

The remaining plaintiffs, too, claim that one or more platforms is responsible for the crimes of third parties who used the platforms to communicate with plaintiffs. The similarities end there. Each case involves different plaintiffs and often distinct defendants, a different perpetrator, and unique events occurring over nearly 20 years. Although Plaintiff alleges her abuser sent her sexually explicit images and tried to assault her, other cases center on crimes involving sending or

receiving child sexual abuse material ("CSAM") (*e.g.*, *Doe v. Roblox*, No. 3:25-cv-03520-YGR (N.D. Cal.), Dkt. No. 1-1 ¶¶ 240-42), kidnapping (or attempted kidnapping), assault, or rape, in more than a dozen different states. (*See, e.g.*, *Doe v. Roblox*, No. 3:25-cv-06087-RFL (N.D. Cal.), Dkt. No. 1-1 ¶¶ 210-11 (rape in Florida in 2022); Compl. ¶ 224, (assault in Alabama in 2024); *Doe v. Roblox*, No. 3:25-cv-04329-RFL (N.D. Cal.), Dkt. No. 1-1 ¶¶ 151-52, (rape in Indiana and Georgia in 2024); *Doe v. Roblox*, No. 3:25-cv-06812-SI (N.D. Cal.), Dkt. No. 1 ¶¶ 8, 223 (attempted kidnapping in Alabama between 2022 and 2025); *Doe v. Roblox*, No. 3:25-cv-02175-SAL (N.D. Tex.), Dkt. No. 1 ¶¶ 156-58 (explicit photographs and sextortion on unidentified platform and sexual molestation in 2007).)

The complaints differ in other material ways. Some allege that a guardian read and relied on certain Defendants' statements, but they do not always identify the same mix of materials, which changed over time. (*E.g.*, *Doe v. Roblox*, No. 3:25-cv-03520-YGR (N.D. Cal.), Dkt. No. 1-1 ¶¶ 232-35 (alleging father reviewed Roblox's 2019 "Parent's Guide"); *Doe v. Roblox*, No. 2:25-cv-04256-CFK (E.D. Pa.), Dkt. No. 1 ¶¶ 231-34 (alleging parent reviewed Roblox's "For Parents" and "FAQ" sections in 2021, as well as its "Trust & Safety" page).) Others contain no such allegations. Plaintiff does not allege her father reviewed any specific statements by Roblox or Discord, set up or managed her accounts, or monitored her activity. (*See* Compl. ¶¶ 219-20, 226.)

Other cases involve not just different platforms, but wildly different features and versions of the same platform. One plaintiff brings claims for alleged conduct in 2007, a year after Roblox's release. (*Doe v. Roblox*, No. 3:25-cv-02175-SAL (N.D. Tex.), Dkt. No. 1 ¶¶ 152-53.) As is evident from the sole document dated 2007 cited in this complaint (*id.* ¶ 42 n.9), Roblox was a fundamentally different platform 18 years ago (before Discord, Snapchat, or Instagram even existed)—a factual issue relevant to Roblox's defense that has no bearing on the other Defendants.

**LEGAL STANDARD**

Coordination is proper when: (1) the cases concern "one or more common questions of fact"; and transfer will (2) serve the "convenience of parties and witnesses"; and (3) "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). "[C]entralization under Section 1407 should be the last solution after considered review of all other options." *In re Six Flags Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 289 F. Supp. 3d 1343, 1345 (J.P.M.L. 2018) (citation omitted). Plaintiff must show that centralization is necessary. *In re Acthar Gel Antitrust Litig.*, 543 F. Supp. 3d 1375, 1376 (J.P.M.L. 2021). Plaintiff has not done so here.

**ARGUMENT**

**I.    THE PANEL SHOULD NOT CENTRALIZE THESE ACTIONS.**

The cases here raise individualized arbitration issues and concern disparate alleged factual circumstances, events, and parties. Because informal coordination is a superior option to efficiently adjudicate such loosely related and highly individualized claims, the Panel should deny transfer.

**A.    The Arbitration Issues Are Distinct.**

Plaintiff argues that centralization will "avoid inconsistent rulings on legal issues," "reduce litigation costs," and "conserve the resources of the parties and the courts," including on the issue of arbitrability. (Mot. at 8, 10, Dkt. No. 1-1.) But the opposite is true: resolution of each motion to compel arbitration will require courts to assess unique facts under potentially different states' laws to determine whether an arbitration agreement exists and can be enforced. This inquiry will significantly *slow* proceedings, mitigating any benefit gained from centralization, and may substantially alter the roster of defendants proceeding in court, undermining such benefit.

***First***, to determine if an agreement to arbitrate exists, courts will have to consider the facts of each case. Defendants may require assent in ways that vary by device (e.g., iPhone, Android phone, web browser, app) and the circumstances in which a plaintiff agrees to arbitrate (e.g.,

account creation, log in, purchase, updated terms). Each plaintiff (including their guardians) may have assented at different times—such as one plaintiff who did so after reaching adulthood. (*See Doe v. Roblox*, No. 4:25-cv-03520-YGR (N.D. Cal.), Dkt. No. 35 at 8-9; *see also id.*, Dkt. No. 37 at 8.) Moreover, the plaintiffs will almost certainly argue that, even if assented to, the arbitration agreements are void. They are not, but resolution of that issue will not benefit from centralization, as certain Defendants may seek to have it decided by an arbitrator. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1133 (9th Cir. 2015) (where no argument "specific to the delegation provision," unconscionability is "for the arbitrator"); *McKinney v. Emery Air Freight Corp.*, 954 F.2d 590, 593 (9th Cir. 1992) (arbitrators decide disaffirmance issues). Even if there were questions of fact for a court, these questions would need to be resolved through evidentiary hearings following discovery into each arbitration agreement. *See* 9 U.S.C. § 4. This weighs against centralization.

**Second**, application of the EFAA requires individualized analysis. For instance, the law does not apply retroactively. *See Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 924 (N.D. Cal. 2023). The harms in some, but not all, cases may have occurred before the EFAA's 2022 enactment. (*Doe v. Roblox*, No. 5:25-cv-00959-SLP (W.D. Okla.), Dkt. No. 1 ¶¶ 156-58 (alleging 2020 sextortion).) And the EFAA applies only to "sexual assault disputes," requiring physical contact. *See* 9 U.S.C. § 401(3); 18 U.S.C. §§ 2246(2)-(3). Some plaintiffs claim no such contact. (*See Doe v. Roblox*, No. 3:25-cv-06812-SI (N.D. Cal.), Dkt. No. 1 ¶ 223; *Doe v. Roblox*, No. 3:25-cv-07486-VC (N.D. Cal.), Dkt. No. 1 ¶ 222.) Finally, the EFAA applies only to pre-dispute agreements. In at least one case, the plaintiff assented to Roblox's and Discord's terms, including mandatory arbitration, after filing suit. (*See Doe v. Roblox*, No. 4:25-cv-03520-YGR (N.D. Cal.), Dkt. No. 35 at 8-9.)

**Third**, arbitrability issues will likely create different tracks for different cases—and even distinct tracks for Defendants within each one. If, for example, any arbitration motions are denied,

those Defendants would be permitted an immediate interlocutory appeal and an automatic stay, potentially creating different tracks within single cases. *See Coinbase, Inc. v. Bielski*, 599 U.S. 736, 743 (2023) (denial of motion to arbitrate is immediately appealable and subject to a mandatory stay); *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig. MDL No. 3040*, No. 2:22-cv-03040, 2024 WL 868239, at *1 (E.D. Mich. Feb. 28, 2024) (applying *Coinbase* to stay a portion of cases in an MDL).[1] Some cases may involve at least one or more such appeals, complicating and delaying any common pretrial proceedings. For example, if a transferee court denies some arbitration motions and denies other Defendants' dispositive motions, all discovery and other pretrial proceedings would need to be stayed until the exhaustion of appeals. Similarly, if Roblox compels claims to arbitration or appeals the denial of an arbitration order, but its co-Defendant in that case does not, those Defendants would find themselves in an MDL without the "common thread" Defendant. (Mot. at 11.) Not only would the supposed rationale for the MDL be erased, but the transferee court would be left to coordinate cases with unstable defendant configurations and claims. Informal coordination with individualized adjudication is a vastly superior method to efficiently tailor case-management strategies to the varying shapes these cases are likely to assume.[2]

---

[1] Although some Panel decisions minimize the impact of arbitration motions on coordination, most predate *Coinbase*, and their reasoning is in tension, if not conflict, with that case. *Compare Coinbase*, 599 U.S. at 743 (requiring automatic stay pending appeal of denial of motion to compel arbitration), *with In re Uber Techs., Inc., Data Sec. Breach Litig.*, 304 F. Supp. 3d 1351, 1354 (J.P.M.L. 2018) (not addressing stay of proceedings pending appeal).

[2] Plaintiff John Doe's contention that Roblox "agreed to a bellwether process" to resolve arbitration motions in a state JCCP is extremely misleading. (*See* Dkt. No. 4 at 11.) The defendants in those cases, having successfully opposed centralization before the Panel, strenuously **opposed** the plaintiffs' petition for coordination of state cases, and once the petition was granted, argued for individual motions to compel arbitration to be filed in each case. (*See, e.g.*, Parties' Joint Rep. & Proposed Agenda for July 10, 2025 Initial Status Conf. at 12-13, *Videogame Addiction Cases*, JCCP No. 5363 (Cal. Super. Ct. L.A. Cnty. July 2, 2025).) That is exactly what happened; the parties are set to brief motions to compel arbitration in six of the cases first. In short, Defendants continue to fight the very process Plaintiff proposes here.

###### B.    The Parties Are Materially Different.

Variations among the parties also weigh against centralization. Each plaintiff alleges unique injuries from communications published by one or more platforms. These unrelated plaintiffs—a mix of minors and adults—live in different states. No defendant other than Roblox is named in more than half the cases, while Snap is named in only four and Meta in only one.

The Panel has consistently declined to transfer cases where multiple defendants are involved—even where one defendant was a "common thread," as Plaintiff alleges (*see* Mot. at 11).[3] The Panel is "typically hesitant to centralize litigation against multiple, competing defendants." *In re Yellow Brass Plumbing Component Prods. Liab. Litig.*, 844 F. Supp. 2d 1377, 1378 (J.P.M.L. 2012) (denying transfer); *see also In re Baby Food*, 544 F. Supp. 3d at 1377 ("We have been cautious when considering industry-wide centralization."). The presence of "multiple unrelated defendants" connected to many unrelated services, *In re Yellow Brass Plumbing*, 844 F. Supp. 2d at 1378, indicates that "[t]he claims against each defendant . . . are likely to rise or fall on facts specific to that defendant," *In re Baby Food*, 544 F. Supp. 3d at 1376.

That is the case here. Although Plaintiff argues that "Roblox is the alleged common thread" (Mot. at 11), she asserts only generically that the cases against Discord "involve substantially the same facts, circumstances, and legal claims," and that the cases against Snap and Meta likewise "assert the same legal claims" and "challenge similar features," such as parental controls and age

---

[3] *See, e.g.*, *In re Children's Pers. Care Prods. Liab. Litig.*, 655 F. Supp. 2d 1365, 1366 (J.P.M.L. 2009) (denying transfer where different defendants sold or manufactured hygiene products "with differing formulations" and where "[o]nly [Johnson & Johnson] is named as a defendant in all actions"); *In re Baby Food Mktg., Sales Pracs. & Prods. Liab. Litig.*, 544 F. Supp. 3d 1375, 1376 (J.P.M.L. 2021) (denying transfer where cases involved different baby-food manufacturers); *In re Video Game Addiction Prods. Liab. Litig.*, 737 F. Supp. 3d 1353, 1355 (J.P.M.L. 2024) (same, cases against videogame makers involved "a broad range of games and defendants . . . with the at-issue games only partially overlapping"); *In re CP4 Fuel Pump Mktg., Sales Pracs., & Prods. Liab. Litig.*, 412 F. Supp. 3d 1365, 1367 (J.P.M.L. 2019) (same, cases against vehicle manufacturers "present[ed] numerous automaker-specific and plaintiff-specific issues").

and identity verification (*id.*). Plaintiff does little to explain, however, how these content filters and related tools are "similar" across platforms. Nor would such an explanation be compelling, given that Defendants' platforms run the gamut from an online gaming platform (Roblox); to a communications service (Discord); to an online camera-based messaging platform (Snapchat); to a social-media platform for photo and video sharing (Instagram).

If any case advances beyond the pleadings, the substantial variations across platforms, factual allegations, and causal theories will require deciding many case-specific questions about each Defendant's practices and features and each plaintiff's interactions with each platform. For example, a transferee court would have to adjudicate questions about each platform's content moderation practices "and its marketing and communications" about those practices. *In re CP4 Fuel Pump Mktg., Sales Pracs., & Prods.*, 412 F. Supp. 3d at 1367. Likewise, each plaintiff had "individual—and varying . . . experiences" with each of the platforms they used. *Id.* Plaintiff implicitly concedes as much. In her effort to paint Roblox as the "common thread" (Mot. at 11), she excludes from her request a case filed against Discord only. (*See Doe v. Discord Inc.*, No. 1:25-cv-01789-DCN (N.D. Ohio), Dkt. No. 1.) That case contains the same general allegations against Discord that appear in the cases Plaintiff seeks to centralize. (*Compare id.* ¶¶ 1-3, 7-8, 17-78, *with* Compl. ¶¶ 1-3, 6-8, 149-88, 195-217.) The only difference is the plaintiff-specific allegations—which are so unique that ***none*** of the cases should be centralized.

Plaintiff tries to downplay the effect of including multiple defendants, suggesting the transferee court may "address unique issues using separate discovery tracks for each defendant or platform and employ separate motion tracks[.]" (Mot. at 11.) The impracticality and burden of conducting multitrack discovery and motion practice to account for defendants named in only some actions underscores that transfer would not "promote the just and efficient conduct" of the

cases here. 28 U.S.C. § 1407(a). Those burdens will only compound if new plaintiffs, alleging claims against new defendants, join the fray—an outcome that an MDL would virtually guarantee. Just as in *In re Video Game Addiction*, 737 F. Supp. 3d at 1354, the most efficient and just procedure is individualized adjudication tailored to the claims asserted against particular defendants and the theories that any future plaintiffs may assert against other defendants.

      **C.**    **The Facts and Merits Issues Are Not the Same.**

      The differing fact and merits issues also weigh against centralization. It is not enough to identify "general common facts" across cases. *In re Hotel Indus. Sex Trafficking Litig. (No. II)*, 730 F. Supp. 3d 1360, 1361-62 (J.P.M.L. 2024) (denying transfer where actions involved "different hotels, different alleged sex trafficking ventures, different hotel brands, different owners and employees, different geographic locales, different witnesses, different indicia of sex trafficking, and different time periods"). Instead, when "unique factual issues" would "overwhelm[]" common questions, centralization is not warranted. *In re Varsity Spirit Athlete Abuse Litig.*, 677 F. Supp. 3d 1376, 1378 (J.P.M.L. 2023) (denying transfer). That is the case here.

      **1.**    **Distinct Incidents at Varying Times and in Different Places.**

      Each complaint alleges unique facts about the perpetrator's identity, their crimes, and the places and times those crimes occurred. (*See supra* Section I.B.) These cases are thus like others involving third-party crimes where the Panel denied centralization. For example, the Panel has twice declined to transfer the *Hotel Industry Sex Trafficking* actions, which concerned commercial sex allegations against hotels, reasoning that the "case-specific facts relating to the alleged involved parties, the relevant time periods, and each plaintiff's experience [were] so varied" that discovery would overwhelm any superficial "general common facts." *In re Hotel Indus. Sex Trafficking Litig. (No. II)*, 730 F. Supp. 3d at 1362-63; *In re Hotel Indus. Sex Trafficking Litig.*, 433 F. Supp. 3d 1353, 1356 (J.P.M.L. 2020). The Panel similarly declined to centralize cases

stemming from the alleged abuse of minor athletes given varying "particulars of the abuse alleged by each plaintiff." *In re Varsity Spirit Athlete Abuse Litig.*, 677 F. Supp. 3d at 1378. More recently, the Panel denied centralization of cases alleging abuse by individuals associated with the Mormon church, as such actions involved "varied circumstances," including specific allegations of abuse. *In re: the Church of Jesus Christ of Latter-Day Saints Sexual Abuse Litig.*, 776 F. Supp. 3d 1356, 1358 (J.P.M.L. 2025).

Here, too, the variations will eliminate any efficiencies from centralization. Should any cases proceed beyond the pleadings stage (none should), discovery will focus on specific incidents, requiring distinct evidence. If a court finds any plaintiff has sufficiently alleged causation (none has), that issue would turn on the facts of each incident, the foreseeability of the perpetrators' conduct, Defendants' knowledge (if any) of that perpetrator, and Defendants' abilities (if any) to control or prevent that perpetrator's superseding acts. *Cf. In re Varsity Spirit Athlete Abuse Litig.*, 677 F. Supp. 3d at 1378 (denying transfer where "[d]iscovery regarding each individual defendant's conduct and their relationship to and interactions with the common defendants will not overlap"). Likewise, the fact that these incidents differ in nature will require unique reviews of each defendant's content-moderation tools—as some might have prevented certain conduct but not others (e.g., blocked CSAM but not messages leading to in-person meetings). (*See* Section I.C.3, *infra* (discussing variations in features and safety mechanisms).) Discovery would proceed piecemeal, "negat[ing] the efficiencies to be gained by centralization." *In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 699 F. Supp. 3d 1396, 1398 (J.P.M.L. 2023); (Mot. at 7-8 (citing *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017)).[4]

---

[4] Although Plaintiff "anticipates that thousands of cases may be filed" (Mot. at 3-4), "the mere possibility of additional actions does not support centralization, even where thousands of actions are predicted," *In re Hotel Indus. Sex Trafficking Litig.*, 433 F. Supp. 3d at 1356. *See also, e.g.*, *In*

Plaintiff relies on *In re Uber Technologies, Inc., Passenger Sexual Assault Litigation* (Mot. at 7-8), but that case is distinguishable. There, the cases involved "sufficient common issues," *In re Uber Techs., Inc.*, 699 F. Supp. 3d at 1398, as plaintiffs' alleged harms stemmed from a ***single app***, plaintiffs were subject to the same policies, and they were sexually assaulted in the same setting through the same asserted chain of causation (i.e., inadequate background checks of drivers and failure to train them on sexual assault and harassment). *Id.* Here, by contrast, the plaintiffs allege that distinct, unrelated platforms each with unique content moderation practices, features, and policies failed to stop different kinds of sexual exploitation both on- and off-platform. (*See supra* Sections I.B-C.) Centralization would therefore complicate—not streamline—any causation assessment. *See In re Uber Techs., Inc.*, 699 F. Supp. 3d at 1398-99 ("sufficient common issues" concerning Uber's knowledge and practices diminished importance of "overarching question[s] of general causation"); *see also In re Asbestos & Asbestos Insulation Material Prods. Liab. Litig.*, 431 F. Supp. 906, 909 (J.P.M.L. 1977) ("question of causation is an individual issue").[5] Given the individualized nature of each plaintiff's factual allegations, it should come as no surprise that similar cases have been litigated individually. *See, e.g.*, *Doe v. Grindr Inc.*, 128 F.4th 1148, 1151

---

*re Hotel Indus. Sex Trafficking Litig. (No. II)*, 730 F. Supp. 3d at 1360-62, 1364 (denying transfer of litigation with over 100 actions pending where no "sufficient common factual questions to justify centralization"); *In re Not-For-Profit Hosps./Uninsured Patients Litig.*, 341 F. Supp. 2d 1354, 1355-56 (J.P.M.L. 2004) (denying transfer of litigation with 28 actions pending in 21 districts due to lack of "sufficient common questions of fact to warrant Section 1407 transfer").

[5] Plaintiff's reliance on *In re Katz Interactive Call Processing Patent Litigation*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007), and *In re Social Media Adolescent Addiction/Personal Injury Products Litigation*, 637 F. Supp. 3d 1377, 1378 (J.P.M.L. 2022), is similarly misplaced. (Mot. at 6.) *Katz* involved "allegations of infringement and invalidity" of a "family of patents," posing "share[d] factual and legal questions[.]" 481 F. Supp. 2d at 1355. The opposite is true here. (*See supra* Sections I.B-C.) In the *Social Media* matter, the cases consistently alleged that the platforms were "defective because they [were] designed to maximize user screen time," allegedly encouraging teen "addiction," and that defendants failed to warn the public about these harms, leading to overlapping causation issues. *Soc. Media Adolescent Addiction/Pers. Injury Prods. Liab. Litig.*, 637 F. Supp. 3d at 1378. Here, the varying platforms, features, and perpetrators will not present "overlapping causation issues."

(9th Cir. 2025) (dismissing claims against dating app used by minor to communicate with men who assaulted him); *M.H. on behalf of C.H. v. Omegle.com*, 122 F.4th 1266, 1273 (11th Cir. 2024) (dismissing claims against site that allegedly facilitated sex trafficking by allowing plaintiff to communicate with adult who coerced CSAM production); *Herrick v. Grindr LLC*, 765 F. App'x 586, 590-91 (2d Cir. 2019) (barring claims based on app's alleged failure to protect against harassing posts); *Doe v. MySpace, Inc.*, 528 F.3d 413, 419-22 (5th Cir. 2008) (dismissing claims against site that allegedly failed to prevent messages between plaintiff and adult assaulter).

### 2.    The Cases Challenge Different Allegedly Fraudulent Statements.

Centralization is also improper because the plaintiffs have alleged purported fraud claims against all Defendants based on distinct statements made over decades on topics ranging from profitability and monetization strategies, to child safety measures, to descriptions of platform features. (*See, e.g.*, *Doe v. Roblox*, No. 3:25-cv-07143-AMO (N.D. Cal.), Dkt. No. 1 ¶¶ 16-200, 202 (alleging general statements by Roblox and Meta from 2007 to 2025 about content moderation, child safety, and privacy, despite which plaintiff's mother "believed that Roblox was not a safe place for children"); *see also, e.g.*, *Doe v. Roblox*, No. 4:25-cv-03520-YGR (N.D. Cal.), Dkt. No. 42 ¶¶ 216-28 (statements by Discord concerning user and child safety); *Doe v. Roblox,* No. 3:25-cv-07143-AMO (N.D. Cal.), Dkt. No. 1 ¶¶ 139-200 (Meta); *Doe v. Roblox*, No. 3:25-cv-07174-AMO (N.D. Cal.), Dkt. No. 1 ¶¶ 150-211 (Snap).)

Compounding this variation, the plaintiffs ***do not*** allege reading or relying on the ***same*** alleged statements. (*See, e.g.*, *Doe v. Roblox*, No. 4:25-cv-03520-YGR (N.D. Cal.), Dkt. No. 42 ¶¶ 233-34 (father allegedly reviewed Roblox materials in 2019); *Doe v. Roblox*, No. 3:25-cv-07143-AMO (N.D. Cal.), Dkt. No. 1 ¶¶ 203-05 (mother enrolled child in third-party Roblox class before account creation); Compl. ¶¶ 219-20 (father relied on "public perception" that Roblox and Discord had "created a safe environment"); *Doe v. Roblox*, No. 3:25-cv-07174-AMO (N.D. Cal.),

Dkt. No. 1 ¶ 221 (no allegations about whether plaintiff or parents reviewed statements by Snap); *Doe v. Roblox*, No. 3:25-cv-07143-AMO (N.D. Cal.), Dkt. No. 1 ¶ 215 (same for Meta).)

This means that each case will turn on what a particular plaintiff (or their guardian) saw and relied on, whether that reliance was reasonable, and whether that statement was fraudulent. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124-25 (9th Cir. 2009). For example, the factfinder would need to conduct entirely different inquiries where one plaintiff's mother alleges relying on the 2019 versions of Roblox's Parent's Guide and Trust & Safety pages (*Doe v. Roblox*, No. 4:25-cv-03520-YGR (N.D. Cal.), Dkt. No. 42 ¶¶ 233-34), another alleges relying on supervision at an in-person "class" (*Doe v. Roblox*, No. 3:25-cv-07143-AMO (N.D. Cal.), Dkt. No. 1 ¶¶ 203-05), and a third plaintiff does not allege relying on any statement (*Doe v. Roblox*, No. 3:25-cv-06812-SI (N.D. Cal.), Dkt. No. 1 ¶ 219). Centralizing cases alleging ***different*** alleged frauds makes little practical sense. *See, e.g.*, *In re Benzoyl Peroxide Mktg., Sales Pracs. & Prods. Liab. Litig.*, 743 F. Supp. 3d 1373, 1374 (J.P.M.L 2024) (no centralization of misrepresentation claims where "defendants' products vary [in how they] are packaged[,] . . . stored, . . . labeled and marketed").

### 3.    The Cases Challenge Different Platforms, Features, and Controls.

Because each plaintiff alleges different facts and events (*see supra* Section I.C.1), no single platform feature cuts across the cases. Instead, the parental controls, platform components, and platforms themselves vary. These variations are even more pronounced given changes over time.

***Different Platforms***: Not a single plaintiff alleges communicating with the perpetrator on a single platform or service. Nor could they, as users may not exchange images or videos on Roblox—the platform Plaintiff characterizes as the "common thread." (Mot. at 11.) Where the plaintiffs identify other platforms, they point to different platform features throughout their claims. For example, one plaintiff alleges injuries from communications exchanged using Discord's video function (*Doe v. Roblox,* No. 4:25-cv-03520-YGR (N.D. Cal.), Dkt. No. 42 ¶¶ 229, 237, 240-43),

another claims injuries from Discord's voice calling function (*Doe v. Roblox*, No. 3:25-cv-07686-RS (N.D. Cal.), Dkt. No. 1 ¶¶ 220, 222-25 (Discord)), another focuses on Snap's disappearing messages and location tracking (*Doe v. Roblox*, No. 2:25-cv-7154-AGR (C.D. Cal.), Dkt. No. 1-1 ¶¶ 119, 158-59 (Snap)), and the sole case involving Instagram focuses on its text messaging (*Doe v. Roblox*, No. 3:25-cv-07143-AMO (N.D. Cal.), Dkt. No. 1 ¶¶ 199, 215, 217).

***Different Parental Controls***: The allegations concerning features are also dissimilar. As to Roblox, some plaintiffs claim screen time and content maturity settings failed, others challenge parental controls for Roblox's chat function, and others do not allege the use of parental controls ***at all***. (*See Doe v. Roblox,* No. 3:25-cv-07686-RS (N.D. Cal.), Dkt. No. 1 ¶¶ 220-26 (alleging "screen-time limits, spending restrictions, and content-maturity settings" failed to stop predation); *Doe v. Roblox*, No. 3:25-cv-00128-JB (S.D. Tex.), Dkt. No. 1 ¶ 207 (alleging plaintiff's mother disabled chat settings and plaintiff later used chat function); *see generally* Compl. (no allegations of using parental controls).) As for Discord, some plaintiffs allege that they were able to create accounts despite being under 13, while others appear to concede their parents' involvement in their use of the app. (*Compare Doe v. Roblox,* No. 5:25-cv-01980-SL (N.D. Ohio), Dkt. No. 1 ¶ 220 (alleging plaintiff was "able to easily create an account despite being under 13 years old at the time"), *with* Compl. ¶ 220 (alleging "[p]laintiff's father trusted that Discord was a safe place for Plaintiff to communicate with her friends").) One plaintiff alleges that her father "blocked" her account and thereafter supervised her Discord use. (*Doe v. Roblox*, No. 4:25-cv-3520-YGR (N.D. Cal.), Dkt. No. 42 ¶ 248).) Others make no allegations about Discord's parental controls at all. (*See generally Doe v. Roblox*, No. 3:25-cv-00128-JB (S.D. Tex.), Dkt. No. 1.)

***Differences Over Time***: The relevant parental controls, messaging rules, safety mechanisms, and platform designs have significantly changed over time. (*See supra* Sections I.C.1-3.) Each case will turn on the features in place when each plaintiff's alleged abuse occurred.

### D.    Informal Coordination Is a Practical Alternative to Centralization.

Plaintiff argues that centralization will help promote efficiency, including by avoiding duplicative discovery. (Mot. at 9-10.) But centralization is unnecessary for that purpose.

To start, the parties have cooperated informally. *See*, *e.g.*, *In re Sorin 3T Heater-Cooler Sys. Prods. Liab. Litig.*, 273 F. Supp. 3d 1357, 1358 (J.P.M.L. 2017) (denying centralization of "sixteen actions and potential tag-along actions pending in six districts" because "any overlapping pretrial proceedings have been and can continue to be handled through informal coordination"). For example, the parties have agreed to briefing schedules for motions to compel arbitration and motions to dismiss, as well as joint stipulations on sealing and a case management plan. (*E.g.*, *Doe v. Roblox*, No. 3:25-cv-00128-JB (S.D. Tex.), Dkt. Nos. 52, 80; *Doe v. Roblox*, No. 4:25-cv-3520-YGR (N.D. Cal), Dkt. Nos. 46, 62.) And Defendants have coordinated to oppose Plaintiff's motion to transfer and motions in other cases. *See In re Blue Spike, LLC, Pat. Litig.*, 278 F. Supp. 3d 1379, 1381 (J.P.M.L. 2017) (denying centralization after defendants "coordinated to file a single brief in response to [Plaintiff's] Section 1407 motion"). Plaintiff has not shown that formal coordination is the only way to achieve such efficiencies.

Centralization is also improper because the cases are in their early stages, 17 of 31 are in the same district, and counsel is largely uniform. *In re Belviq (Lorcaserin HCl) Prods. Liab. Litig.*, 555 F. Supp. 3d 1369, 1370 (J.P.M.L. 2021) (no transfer where "[a]ll actions are in their early stages[;] Plaintiffs in over half the actions . . . are represented by the same counsel[;] four of the other actions are pending in the same district[; and] defendants are represented in all underlying actions by national counsel, who are coordinating[.]"); *see also In re Varsity Spirit Athlete Abuse*

*Litig.*, 677 F. Supp. 3d at 1378 (no centralization where parties agreed to staggered briefing schedule and 40% of cases were before same judge). Continued coordination, not the "last solution" of centralization, is the most efficient path. *In re Baby Food*, 544 F. Supp. 3d at 1377.

Plaintiff's concerns about duplicative discovery and conflicting rulings and schedules, can also be addressed through continued cooperation. *See In re Maybelline New York & L'Oréal Paris Cosmetic Prods. Mktg. & Sales Pracs. Litig.*, 949 F. Supp. 2d 1367, 1367-68 (J.P.M.L. 2013) ("duplicative discovery and inconsistent pretrial rulings can be minimized through voluntary cooperation and coordination"); *see also In re Eli Lilly & Co. (Cephalexin Monohydrate) Pat. Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978) (noting parties could cross-notice depositions, address discovery inefficiencies through stipulations, seek orders from the involved courts directing pretrial coordination, or seek stay). And given the involvement of different platforms in each case, and different sequences of events that led to alleged abuse, discovery will vary by case.

Informal coordination is both practical and a superior means of achieving efficiencies here. Maintaining the individual character of these actions and allowing courts to tailor appropriate case-management strategies that account for varying defendants, claims, and factual theories will best achieve just and efficient adjudication. By contrast, formulating a coordinated case-management plan that somehow accounts for the drastic variations in these cases—which remain in flux pending motions to compel arbitration—would virtually guarantee inefficiency and delay.

## II.    ANY CENTRALIZATION SHOULD OCCUR IN THE NORTHERN DISTRICT OF CALIFORNIA.

Should the Panel grant Plaintiff's motion for transfer, Defendants do not oppose transfer to the Northern District of California. Defendants respectfully suggest, however, that any MDL be assigned to either Judge Beth L. Freeman or Judge Rita F. Lin. As of March 31, 2025, neither had motions pending for longer than six months. (*See* "CJRA Table 8: U.S. District Courts—Report Of Motions Pending Over Six Months," U.S. Courts, available here.) Both have efficient and

manageable civil dockets.[6] Both judges have experience with the threshold merits issues. *See, e.g.*, *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1191, 1213 (N.D. Cal. 2025) (analyzing application of First Amendment and Section 230 in constitutional challenge to California statute) (Freeman, J.); *Doe (K.B.) v. Backpage.com, LLC*, 768 F. Supp. 3d 1057, 1063-66 (N.D. Cal. 2025) (applying First Amendment and Section 230 to claims against platform) (Lin, J.). Although Judge Lin has not handled an MDL, she has experience with other aspects of this case, including the EFAA. *See Van De Hey v. EPAM Sys. Inc.*, No. 3:24-cv-08800, 2025 WL 829604 (N.D. Cal. Feb. 28, 2025). The Panel often prefers a "skilled jurist who has not yet had the opportunity to preside over an MDL," especially where, as here, an action is before that jurist. *In re Dividend Solar Fin., LLC, & Fifth Third Bank Sales & Lending Pracs. Litig.*, 753 F. Supp. 3d 1365, 1367 (J.P.M.L. 2024); *see In re Keffer Dev. Servs., LLC, Data Sec. Breach Litig.*, MDL No. 3159, 2025 WL 2327173, at *2 (J.P.M.L. Aug. 8, 2025) (same). And Judge Freeman is "an experienced MDL jurist" who this panel has emphasized would "steer [an MDL] on a prudent and expeditious course." *In re Future Motion, Inc. Prods. Liab. Litig.*, 709 F. Supp. 3d 1394, 1397 (J.P.M.L. 2023).

The Panel should reject the tag-along plaintiffs' requests for a transfer to the Western District of Missouri or the Eastern District of Pennsylvania, states where no Defendant is based and to which cross-country travel would be required for counsel and witnesses and where only a few cases are pending. (Dkt. No. 7 at 2-3; Dkt. No. 11 at 3-5; Dkt. No. 16 at 8-12.)

## CONCLUSION

For these reasons, the Panel should deny Plaintiff's motion for transfer.

---

[6] (*See* "District Judge Beth Labson Freeman," Lex Machina, https://law.lexmachina.com/federal-court/judge/3506 (last visited Oct. 14, 2025) (401 open civil cases); "District Judge Rita Faye Lin," Lex Machina, https://law.lexmachina.com/federal-court/judge/13761006 (last visited Oct. 14, 2025) (257 open civil cases).)

Dated: October 14, 2025

Respectfully submitted,

**COOLEY LLP**

*/s/ Tiana Demas*
Tiana Demas
110 N. Wacker Drive, Suite 4200
Chicago, IL 60606
Telephone: (312) 881-6500
Facsimile:  (312) 881-6598
Email: tdemas@cooley.com

*Counsel for Defendant Roblox Corporation*

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Ambika Kumar (with consent)*
Ambika Kumar
920 Fifth Avenue, #3300
Seattle, WA 98104
Telephone: (206) 757-8030
Facsimile:  (206) 757-7700
Email: ambikakumar@dwt.com

*Counsel for Defendant Discord, Inc.*

**O'MELVENY & MYERS LLP**

*/s/ Leah Godesky (with consent)*
Leah Godesky
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779
Email: lgodesky@omm.com

*Counsel for Defendant Snap, Inc.*

**COVINGTON & BURLING LLP**

*/s/ Isaac D. Chaput (with consent)*
Isaac D. Chaput
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone:  (415) 591-6000

Facsimile:  (415) 591-6091
Email: ichaput@cov.com

*Counsel for Defendant Meta Platforms, Inc.*